UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE

```
IN RE:                          )
                                )
RICIA ANN DANIELS               ) Case No. 15-32067-SGJ-7
OLAJUWON AKINOLA                ) Case No. 15-33290-SGJ-7
JARICIA GWENDOLYN DANIELS       ) Case No. 15-33340-SGJ-7
                                )
        Individual Debtors.     )
                                ) September 24, 2015
_____) Dallas, Texas
```

Show Cause Hearing:  Order to appear and show cause why debtors'
cases should not be dismissed with prejudice for two years, [54].


Appearances:

                              Ricia Ann Daniels, *pro se*

                              Jaricia Gwendolyn Daniels, *pro se*

                              Olajuwon Akinola, *pro se*

For Creditor DeLayne      Robert Eldrige Bone, Esq.
Apartments LLC:           O'Conor Mason & Bone, P.C.
                          1616 South Voss, Suite 200
                          Houston, Texas   77057


For Creditor Icon         Daniel Paz, Esq.
Tower, LP:                Higier Allen & Lautin, P.C.
                          The Tower at Cityplace
                          2711 North Haskell Avenue, Suite 2400
                          Dallas, Texas   75204


For BH Dallas             Jeff LeForce, Esq.
Portfolio, LLC:           LeForce Law, PLLC
                          4925 Greenville Avenue, Suite 200
                          Dallas, Texas   75206

Appearances continued on next page.

2

Appearances continued:

From the Office of          Mary Fran Durham, Attorney
the U.S. Trustee:           U.S. Department of Justice
                            Office of the U.S. Trustee, Region 6
                            1100 Commerce Street, Room 976
                            Dallas, Texas  75242-1496

Digital Court               United States Bankruptcy Court
Reporter:                   Northern District of Texas
                            Cathy Ecker, Judicial Support Specialist
                            Earle Cabell Building, U.S. Courthouse
                            1100 Commerce Street, Room 1254
                            Dallas, Texas  75242
                            (214) 753-2065, direct; 753-2072, fax

Certified Electronic        Palmer Reporting Services
Transcriber:                1948 Diamond Oak Way
                            Manteca, California  95336-9124
                            (800) 665-6251

            Proceedings recorded by digital recording;
  transcript produced by federally-approved transcription service.

3

<u>I N D E X</u>

Witnesses:

| | By the Court | Cross | Redirect | Recross |
|---|---|---|---|---|
| Olajuwon Akinola: | 9 | | | |

The Ruling of the Court:      page 28

*Show Cause Hearing*                                                4

2                    P R O C E E D I N G S

3          THE COURT:  All right, back on the record.

4          Let's go ahead and get appearances now in the three

5    related cases of:  Ricia Daniels, Jaricia Daniels, and Olajuwon

6    Akinola.

7          MS. DURHAM:  Good afternoon, Judge Jernigan.  Mary

8    Fran Durham for the U.S. Trustee.

9          THE COURT:  Okay.

10          MR. LEFORCE:  Good afternoon, Your Honor.  Jeff

11    LeForce on behalf of BH Dallas Portfolio, LLC, the commercial

12    landlord in the Jaricia Daniels case.

13          THE COURT:  Okay.  We've had lots of landlords.  Will

14    you tell me which address that is?  We've got Mr. Paz back

15    there.

16          MR. LEFORCE:  It is — it's the commercial lease on —

17    there was a motion to assume a lease as well — or a statement

18    regarding leases as well as on the Schedule Executory Contracts

19    and Leases in Ms. Daniels' case, because — I'm sorry, I don't

20    have the actual address off the top of my head.  I believe it's

21    on Midway Road, Your Honor.

22          THE COURT:  Midway, okay.  I'm looking through all of

23    our different leases.  Okay, well, again it's BH Dallas...

24          MR. LEFORCE:  Portfolio comma LLC.

25          THE COURT:  Portfolio.

*Show Cause Hearing*                                                     5

1        MR. LEFORCE:  And, as I understand it, we're the only

2   commercial lease in the case.

3        THE COURT:  Oh, no, you're not on — well, I don't

4   know.

5        MR. LEFORCE:  Okay.

6      (Laughter.)

7        THE COURT:  Maybe you are.  I have Skillman, Audelia.

8   9205 Skillman Street, I thought that was commercial.  I don't

9   know, maybe you are.

10        Pardon?

11      (Brief comment outside of the range of the microphones.)

12        THE COURT:  Okay, all right.  Thank you.

13        MR. LEFORCE:  I'm sorry, Your Honor, I didn't have the

14   full information for you.

15        THE COURT:  Well, I've had a lot of landlords, so I'm

16   just having trouble keeping track, okay.

17        MR. PAZ:  Good afternoon, Your Honor.  Daniel Paz for

18   Icon Tower, the Cirque, the residential property.

19        THE COURT:  That's the Cirque, the residential.

20        MR. PAZ:  Yes.

21        THE COURT:  Um-hum.  Okay.

22        MR. BONE:  Good afternoon, Your Honor.  Robert Bone,

23   B-o-n-e, with O'Conor, Mason and Bone.  I represent DeLayne

24   Apartments, LLC.  They're the other residential landlord for the

25   premises located at 1089 West Exchange Parkway, Number 9210,

*Show Cause Hearing*                                                      6

1    Allen, Texas.

2              THE COURT:  Okay.  Thank you.

3              All right.  Do we have Ricia Daniels, Jaricia Daniels,

4    and Olajuwon Akinola all here today?

5              All right.  If you will come forward.  Still no

6    lawyers representing any of the three of you?

7              MS. RICIA DANIELS:  I can't afford one right now, Your

8    Honor.

9              THE COURT:  All right.  Well, I'll need to swear you

10   in since you aren't lawyers.  Please raise your right hands, all

11   of you.

12              RICIA ANN DANIELS, DEBTOR, SWORN

13              OLAJUWON AKINOLA, DEBTOR, SWORN

14         JARICIA GWENDOLYN DANIELS, DEBTOR, SWORN

15              MS. RICIA DANIELS:  Yes.

16              MS. JARICIA DANIELS:  Yes.

17              THE COURT:  Okay.  Thank you.

18              Well, I will recap for the record why we are here

19   today.  We were last here for a status conference on all three

20   of your cases on August 25th, 2015.  I say we were here.  Mr.

21   Akinola, you weren't here, but both Ms. Daniels were here.

22              I set the status conference that we had on August 25th

23   for, I guess you'd say, three main reasons.  Number one, I was

24   concerned about what I said were irregularities in the

25   bankruptcy schedules, in other bankruptcy paperwork that the

*Show Cause Hearing*                                              7

1   three of you filed.  And I know you won't — are not represented

2   by a lawyer, but still there were a whole lot of questions I

3   had.

4          Second, I had an application to waive the filing fee

5   by both Jaricia and Mr. Akinola, and I had questions about that,

6   but the third main reason I had set the status conference back

7   in August was it appeared we might have healthcare businesses

8   that you were each engaged in.  And the Bankruptcy Code requires

9   me to have a status conference the first 30 days after a

10  bankruptcy case is filed if there is a healthcare business

11  involved.  That's required by the Bankruptcy Code, because I

12  have to investigate whether we need a patient care ombudsman to

13  be appointed.  Okay.  That's a term of art in the Bankruptcy

14  Code whenever a healthcare is somehow involved in a bankruptcy

15  case.

16         So some of us were here on August 25th, and I ended up

17  learning — we had a lot of people there that day, not just the

18  two Ms. Daniels but we had the U.S. Trustee, we had an Assistant

19  U.S. Attorney who's been involved in some litigation with Ricia

20  Daniels.  We had two bankruptcy trustees.  We had some

21  landlords.

22         The end result of that hearing was I ended up having

23  huge concerns that I had some forged documents.  The credit

24  counseling certificate in your cases appeared to be forged.  I

25  was also very concerned, knowing that Jaricia is only 19 years

*Show Cause Hearing*                                                    8

1   old, that's surely the youngest person I've ever had file

2   bankruptcy, and it appeared really it was your mom.  I mean it

3   breaks my heart, but it looks like you were kind of using your

4   daughter to get some benefits of bankruptcy.

5           I heard testimony that Jaricia is engaged in a tax

6   return preparation service and also a healthcare business, which

7   for a 19-year-old that's pretty, pretty farfetched, I thought.

8           And, last but not least, Mr. Olajuwon, I had ordered

9   you to appear — I'm sorry, I keep — is it — is your first name

10  Olajuwon or is your last name Olajuwon?

11          MR. AKINOLA:  My first name is Olajuwon.

12          THE COURT:  Your first name, okay.

13          MR. AKINOLA:  Correct.

14          THE COURT:  I keep getting that mixed up.  Anyway, I,

15  you know, ended up hearing tes- — you weren't here, even though

16  I ordered you to appear.  You're here today, I'm glad about

17  that.  But the end result was I issued a follow-up order, which

18  I presume you've all seen, after the August 25th hearing,

19  directing you all three to appear here today and show cause why

20  I should not dismiss all three of your cases for bad faith, as

21  bad faith filings.  And if I dismiss them, I said I would likely

22  dismiss them with a bar order barring you from filing any new

23  bankruptcy cases for a two-year period.

24          So basically this is your chance here today to say

25  something to convince me otherwise.  If you want your cases to

*Akinola - Examination by the Court*                                    9

1   remain open and get bankruptcy relief, you're going to have to

2   convince me why that's the right thing to do.

3                    EXAMINATION BY THE COURT

4                     OF DEBTOR AKINOLA

5   BY JUDGE JERNIGAN:

6   Q.   So I'm going to start with you, Mr. Akinola, because you

7   haven't been in court before for me to know what's going on with

8   you.  What would you like to say?

9   A.   My name is Olajuwon Akinola.  And I'm here at the Bankruptcy

10  Court to present myself, that I've been having some financial

11  struggle with my business, myself as an individual for the past

12  couple of months.  And the funding for my business, I start

13  since December, you know, I don't have any patients and due to

14  the high standard of my office, you know, lots of property, that

15  file an eviction on me and they didn't pay with respect to the

16  bankruptcy order, you know, they move all of my stuff out of the

17  office and I'm expecting them to the extent because that has

18  really affected my business even though I don't have any funding

19  for now.  And, you know, my business account is, you know, I

20  don't —

21  Q.   Tell me about your business.

22  A.   It's Hebrews Healthcare Services DBA —

23  Q.   Hebrew — can you —

24  A.   Hebrews.

25  Q.   Can you pull the microphone up.  You are a very tall man.

*Akinola - Examination by the Court*                                    10

1   A.   So I can raise it up and up —

2   Q.   And so the microphone is — there you go.  Okay.  Hebrew —

3   A.   Hebrews Healthcare Services.

4   Q.   Healthcare Services.

5   A.   Yeah.  DBA Little Dove Pediatric Home Health.

6   Q.   Doing business as Little Dove Pediatric —

7   A.   Yes.

8   Q.   — Home Health?

9   A.   Yes.  When I'm not —

10  Q.   Is that your — your only business or do you have multiple

11  businesses —

12  A.   I have multiple businesses.

13  Q.   What are your other businesses?

14  A.   I have quite a few businesses in that —

15  Q.   Well, in bankruptcy you're supposed to disclose all those.

16  Now tell me what other businesses you have.

17  A.   Guru Tax Services.

18  Q.   Guru Tax Services?

19  A.   Uh-huh.

20  Q.   Okay.

21  A.   Yes.

22  Q.   What else?

23  A.   And I'm the founder of Community Base Child Placing Agency

24  and Adoption —

25  Q.   Wait, say it again?

*Akinola - Examination by the Court*                                    11

1    A.   Community Based —

2    Q.   Community Based...

3    A.   — yeah — Child Placing Agency and Adoption Agency —

4    Q.   — Child Placement Agency —

5    A.   Uh-huh.

6    Q.   — and Adoption Agency —

7    A.   Yeah.  Yes.  Yes, ma'am.  And Savannah Career Institute.

8    Q.   And what?

9    A.   Savannah Career Institute.

10   Q.   Savannah Career Institute?

11   A.   Yes.

12   Q.   Any others?

13   A.   A Dream Home for Dad and Mom.

14   Q.   A what?

15   A.   A Dream Home —

16   Q.   A Dream Home?

17   A.   — for Dad and Mom.

18   Q.   For Dad and Mom.  My goodness, you have a lot of businesses.

19   Any others?

20   A.   For now I think that's all I can remember, for now.

21   Q.   That's all you can remember?

22   A.   Yeah.

23   Q.   You have trouble remembering your businesses, you have so

24   many?

25   A.   No.  I mean some that I have on there.  I mean a lot of them

*Akinola - Examination by the Court* 12

1   are kind of new businesses or —

2   Q.   A lot of them what?

3   A.   Are kind of new and awaiting some governmental contracts and

4   some contracts and some other stuff —

5   Q.   Awaiting governmental contracts.  Well, tell me what your

6   sources of revenue are?

7   A.   Hebrews Healthcare is the only source of, you know, income

8   right now.  And I haven't — you know, have any, you know,

9   patient or income cashflow for past couple of months.

10   Q.   Okay.  I've heard two different things there.  You said

11   Hebrew Healthcare Services —

12   A.   Yeah.

13   Q.   — is your only source of revenue?

14   A.   Yes, that's generating income as of — yeah —

15   Q.   But then you said, "...I haven't...[had] any...income [from

16   it] for [the] past couple of months"?

17   A.   Yes.  I mean it is the only one that has been — you know,

18   other businesses, they haven't made a dime.  That's what I

19   meant, you know, Hebrews —

20   Q.   Oh, but Hebrews —

21   A.   — as a — yeah.

22   Q.   — Healthcare Services is?

23   A.   Has made money, but for the past couple of months hasn't, I

24   don't have any, you know, any income through it, you know,

25   actually since December last year, 2014.

*Akinola - Examination by the Court*                                13

1   Q.  What kind of healthcare services are being provided to what

2   kind of patients?

3   A.  It's for medically-fragile children.  Medically-fragile —

4   Q.  Medically fragile.

5   A.  Children.

6   Q.  What — what —

7   A.  Kids that are born with congenital birth defects and all

8   kinds of, you know, diagnoses or genetic disorders.  You know,

9   they might be on G-tube team, they can't eat, that can't

10  swallow; or have some kind of respiratory issue, that are on a

11  vent in trach.  You know, so the Agency provide private duty

12  nursing, you know, 24-hour care, instead of being in the

13  hospital.  So it's kind of more cost-effective for the — you

14  know, for insurance and government and HMOs and stuff to be in

15  their home settings.  And why I — you know, my agency supply

16  them.

17  Q.  Your agency is supplying —

18  A.  The medical staff —

19  Q.  — home healthcare to these medically-fragile children?

20  A.  Yes, ma'am.  Yes, ma'am.

21  Q.  Okay.  What is your medical background?

22  A.  Yes.  My medical, I have a couple of degrees, you know, in

23  the medical field.  I was graduated from University of West

24  Indies MBSA —

25  Q.  You graduated from where?

*Akinola - Examination by the Court*                                    14

1   A.   University of West Indies.  I schooled in the Caribbean.  My

2   degree is in Caribbean now, which is equivalent to an M.D.

3   degree over here, but I haven't passed my medical license in

4   that in the United States.  But in United States I have a couple

5   of degrees also, the CN, the LVN, the RN in the United States,

6   so —

7   Q.   You are an RN?

8   A.   Yes.  So I work as a registered nurse as of now in United

9   States of America.

10  Q.   And so who pays for the healthcare services?

11  A.   Insurance and, you know, —

12  Q.   Insurance?

13  A.   Yeah, insurance and, you know, HMO, Medicare, Medicaid, and

14  all of stuff is —

15  Q.   So why — why has there not been cashflow in since December?

16  A.   Yeah, because I don't have any client as of now.  The

17  referral service is not there, and the funding for VERA

18  (phonetic) and all kinds of stuff has been really, really slow,

19  so I don't have any client.

20  Q.   All right.  Well, let me ask you have you had your first

21  meeting of creditors yet?

22  A.   No.  No, ma'am, I haven't.  I think that due to all to — all

23  to —

24  Q.   Where are the patient record — where are the patient

25  records?

*Akinola - Examination by the Court*                                    15

1   A.  Boxer Property moved my stuff out of the office.  They

2   moved.  And I filed a motion, the first motion and the second

3   one to set a conference, you know, —

4   Q.  I saw that.

5   A.  Yes, I filed two different —

6   Q.  And you filed it, I think, the same day you didn't show up

7   for a hearing.

8   A.  Yes.  Because the hearing — because what happened was the

9   order you sent, I didn't get it in the mail.  The one that I got

10  in the mail was — and I attached it, I don't know if you saw the

11  one for Christon One, the Carlton Christon One (phonetic) for

12  the eviction caught.  And you know that was called Christon One.

13  That is the one I saw that has sought me.  You know, that the

14  office had — because the Boxer did not turn the dol- — so that I

15  didn't know that I have another, you know, hearing.  I thought

16  it was just Ricia Daniels because I didn't receive any — any

17  such notice from the Bankruptcy Court, ma'am.

18  Q.  Tell me about the tax business, the tax Guru.

19  A.  Yeah.  The Guru Tax Services is a business that I

20  incorporated a few years ago and, you know, is in the process

21  of, you know, getting clients and doing — naturally I don't have

22  the fund to, you know, actually do the marketing, hire, payroll

23  and everything.  You know, so it's just I set it up, I have

24  everything ready, but I have not actually, you know, wor- —

25  Q.  So you're not actually —

*Akinola - Examination by the Court*                                          16

1    A.  Do — making any, no, no.  I haven't made any money in it,

2    no, ma'am.

3    Q.  Do you have business with either Ms. Daniels?

4    A.  No.  I don't have any —

5    Q.  So it's just a coincidence that they each should have tax

6    businesses —

7    A.  Yeah.

8    Q.  — and you're Ms. Daniels' boyfriend, I guess?

9    A.  Yes.  Yes.  Yes, I have my tax business before, you know, I

10   met her, and so lately she has hers too.

11   Q.  You don't have any of your licenses on your bankruptcy

12   schedules.  You said you're an RN — what all kinds of degrees do

13   you — you're an RN and what else?

14   A.  LVN.  CNA, LVN, and RN.  RN is the highest.  You know, so a

15   register nurse, yes, RN.

16   Q.  Okay.  LVN and what is the third thing?

17   A.  CNN, LVN, and RN.

18   Q.  CNN?

19   A.  Yeah, CNA.

20   Q.  What is it?

21   A.  CNA.  CNA, —

22   Q.  C- —

23   A.  — LVN, and RN.

24   Q.  What is CNA?  I don't know —

25   A.  Certified Nursing Assistant.

*Akinola - Examination by the Court*                    17

1  Q.  What?

2  A.  Certified Nursing Assistant.  Certified Nursing Assistant.

3  Q.  I hear assistant but I'm not sure what.

4  A.  Assis- —

5          MS. RICIA DANIELS:  Certified —

6          THE COURT:  What now?

7          MS. RICIA DANIELS:  Certified Nurse Assistant.

8  BY JUDGE JERNIGAN:

9  Q.  Okay.  Your Statement of Financial Affairs, you put no down

10  — income down for the past two years.

11  A.  Well, what now?

12  Q.  I'm looking at your Statement of Financial Affairs.  "Take

13  the gross amount of income you have received from employment,

14  trade, or profession, or from operation of a business, including

15  part-time activities during the two years immediately preceding

16  the case" —

17  A.  I give — I give them my statement, and the lady told me it

18  covers all of that, my bank statement.  My bank statement.

19  Okay, the bank statement —

20  Q.  I see, yeah, a bank statement, but that's —

21  A.  You —

22  Q.  — but that's not — you didn't answer the question.

23  A.  But that is what she told like, you know, where I —

24  Q.  She who?

25  A.  I told her that for all of these —

*Akinola - Examination by the Court*                                   18

1  Q.  Her who?

2  A.  The bankruptcy lady that filed my stuff for me, so she said

3  to —

4  Q.  What lady?

5  A.  I don't — I forgot what her name, but she told me the — my

6  statement covers all of that in the area —

7  Q.  Okay.  I need to be clear who you're talking about.  Who

8  filed your paperwork?

9  A.  I don't — I don't remember.  I don't remember what her — I

10  don't remember, but it was —

11  Q.  You gave a person whose name you don't know your bank

12  account statements?

13  A.  Because she works at a Bankruptcy Court.  Now —

14  Q.  Oh, you're talking about someone who worked at the

15  Bankruptcy Clerk's Office?

16  A.  Yes.  So my understanding was, you know, the bank statement

17  would cover all of that —

18  Q.  Okay.  Well, those people don't give you legal advice, and

19  so —

20  A.  Yeah.  She did not advise me with this —

21  Q.  — you've put none, none, none, none, none, none, none, none,

22  none, n-o-n-e, none on every single question on your Statement

23  of Financial Affairs.

24  A.  Because my understanding was that the statement of account

25  would cover all of that question, Your Honor.

*Akinola - Examination by the Court*                    19

1    Q.  Sir, there are questions on here regarding, you know, you

2    have to tell businesses that you're associated with, where your

3    books and records are, the income you've earned, payments you've

4    made, transfers you've made, bank accounts, closed bank

5    accounts.  You've put "none" on everything.

6    A.  Yeah, because I understand it was the bank statement would —

7    you know, my bank statement that I pulled, I don't know if you

8    see that, that would — that —

9    Q.  I see a bank statement, but that —

10   A.  — yeah, that would cover —

11   Q.  — that doesn't come close to giving all the information you

12   needed to give —

13   A.  For — for the — those questions, okay.  I see what —

14   Q.  Yeah.

15   A.  — you say, ma'am.  Yeah, but —

16   Q.  Do you have anything to tell me about why I should keep your

17   case open?

18   A.  Yes.  I think you should keep my case open because I'm in a

19   very deep financials until I can get some clients and, you know,

20   then I can back pay file too because I —

21   Q.  What debt problems are you needing to deal with?

22   A.  I don't — because, you know, paying my rents and, you know,

23   utilities and, you know, I need a shelter over my head.  And

24   Boxer Property, they're not making life easy now by moving all

25   of my stuff out and locking it down for my offices.  I can't do

*Akinola - Examination by the Court*                                    20

1   any business transaction.  And, you know, I'm close to being

2   homeless —

3   Q.  Okay.  Bankruptcy in Chapter 7, which you filed, is about

4   trying to get a discharge of your past due debt, okay?  I can't

5   make a landlord let you live there for free or make the utility

6   companies keep the lights on for free going forward.  It's

7   supposed to take care of your past problems.  So what are your

8   past problems that you're filing bankruptcy to hopefully deal

9   with?

10  A.  Yeah.  You know, all of my debts.

11  Q.  What debts?

12  A.  My car debt, my IRS debts.  You know, any debt that I've

13  owned that I've — that would mean —

14  Q.  What — tell me what those are.  I see a GM Financial, —

15  A.  Yeah, yeah.  That's the car —

16  Q.  — $11,449.

17  A.  Yeah.  That's a —

18  Q.  What is that about?

19  A.  That is a car that I did a — that I get — I got a loan on, a

20  car loan on a Toyota Avalon 2006, you know, to help me with my

21  credit for, you know, —

22  Q.  You have what kind of car?

23  A.  Toyota Avalon 2000- —

24  Q.  A Toyota Avalon, but it's not — you don't list any car —

25  A.  — 2006, but they repossessed it.  It's gone.

*Akinola - Examination by the Court*                    21

1    Q.   Okay.

2    A.   It's repossessed.

3    Q.   Because it's not on your schedules?

4    A.   No, it's not.  It's gone.

5    Q.   Okay.  How did you get here today?

6    A.   Ricia Daniels brought me here.

7    Q.   Okay.  You have Attorney General, $18,000.  What's that

8    about?

9    A.   That's child support.

10   Q.   You only have two other debts listed, State Farm, $5,708.

11   What's that?

12   A.   It's some kind of an on-loan incident that they file over my

13   — my record, my — against my driver's license, they augment, you

14   know, back in 2000- —

15   Q.   What now?

16   A.   I said it was an on-loan incident that I don't — I'm not

17   aware of that they filed against my driver's license when I used

18   to drive around, taking care of patients.  You know, they file

19   it, the insurance company, you know, filed it that I — you know,

20   that saying patient that I run over the yard, or something like

21   that.  I know, it's been years ago, so they filed it on my

22   driver's license, I mean I think that you understand.

23   Q.   Filed it on your driver's license?

24   A.   Yes.  They filed it because they asked who were you driving,

25   you know, driving issue that I —

*Akinola - Examination by the Court*                                    22

1   Q.  And then Logics Communication.  I mean you list four — I

2   think that's all — well, no, we have a few more on Schedule F.

3   Texas Department Aging Disability, $13,000.  What's that?

4   A.  Yeah.  That's a fine, that's a fine.

5   Q.  It's a fine for what?

6   A.  For my policy, for my business.

7   Q.  For what?

8   A.  My business fine.

9   Q.  Why were you fined?

10  A.  Just for survey, you know, a few things that was out of line

11  when I got surveyed for my business.

12  Q.  Okay.  You're — I don't understand.  What kind of fine —

13  A.  Is a — is a fine.

14  Q.  For what?

15  A.  For some issues when they came out for survey.  You know, —

16  Q.  They came out for a survey?

17  A.  Yeah.  Like my employee, okay, this, this, that, that.  You

18  know, you didn't this paperwork, that paperwork.  So it's a

19  fine.

20  Q.  Why Aging Disability if you're working with children,

21  medically-fragile children?

22  A.  Yes.  Because they're the one that control everything.  They

23  control the license and everything.

24  Q.  I wish I understood what the issues were.

25  A.  Is a fine.  Okay, when —

*Akinola - Examination by the Court* 23

1  Q.  I understand, but I'm trying to understand what you were

2  doing wrong that —

3  A.  No, I wasn't doing —

4  Q.  — or what they say you were doing wrong?

5  A.  Yeah.  It's just paperwork.  Like, oh, this record, employee

6  or we misplaced it all within.  Do this particular education.

7  You know, it's just no more business, you know, paperwork fine.

8  Q.  Texas Workforce Commission, $14,208.  What's that?

9  A.  That is the Texas Workforce Commission of the — a — it's

10  being for my employee when funds stop coming, you know, I

11  couldn't afford payroll.  You know, so it's on there.

12  Q.  I don't understand that.  IRS, $20,000.  Department of

13  Treasury, another 17,000.  Department of Education, 16,000.

14  A.  Yes.

15  Q.  How did — how did you accrue these — well, the IRS debt, for

16  example?

17  A.  Yeah.  The IRS?

18  Q.  Yes.

19  A.  Yeah.  The IRS is, you know, my personal W2 issue that I had

20  in the past, you know, because I worked multiple jobs in the

21  past —

22  Q.  You — you have a lot of issues, but I'm not sure bankruptcy

23  is the answer to your problems.

24  A.  I've been —

25  Q.  Why don't — why don't you have a lawyer helping you?  If

*Akinola - Examination by the Court*                              24

1    you're going to be in all of these different businesses,

2    especially healthcare, why don't you have a lawyer?

3    A.   Lawyer for my bankruptcy?

4    Q.   Well, that too, but apparently you're not doing business in

5    full compliance with the law if you have all of these

6    governmental agencies that have big claims against you.

7    A.   No.   They don't — I don't have — is a normal thing that

8    every business owner goes through, everybody.   The best agency

9    get a fine because employees, you can't control some employees.

10   They do whatever — you know, that know — if anybody comes out of

11   a survey and represent claim, even the agents would be looking

12   like, no, that shouldn't, because you can't control people.

13   It's too many things that I can't control.   Is not — is not my —

14   you know, these — I can't — these people, employee would do, I

15   can't beat them, I can't slap — they, so —

16   Q.   Okay.   So here's what it —

17   A.   — there — there will be some —

18   Q.   — looks like and you can tell me whatever you want.

19   A.   Um-hum.

20   Q.   It looks like you filed bankruptcy to get an automatic stay

21   to try to keep your landlord or landlords, plural, from evicting

22   you.   But your paperwork has all kinds of problems.   You have a

23   lot of problems that can't be solved with a bankruptcy.   Tax

24   debt is usually not going to be discharged by a bankruptcy.

25   Student loan debt, it looks like maybe you have some of that.

*Akinola - Examination by the Court*                                      25

1   It's not going to be discharged by a bankruptcy.

2   A.   That —

3   Q.   Texas Workforce, Texas Department of Disability, not a

4   strong chance you're going to get that discharged.   Eighteen

5   thousand dollars worth of back child support, that's not going

6   to get discharged.

7   A.   The tax stuff is just in there, a W2, not some of the —

8   Q.   Okay.   I'm just saying that you haven't complied with the

9   basic paperwork requirements here and most of your debt looks

10  like it's not dischargeable anyway, and you filed a Chapter 7,

11  not — not a repayment plan and chapter.

12  A.   It has really helped a lot.   It is really helping me and,

13  you know, keeping this bankruptcy is going to help me more

14  until, you know, my business, you know, gets back up.   You know,

15  and I didn't file it to get my landlord not to pay.   I filed it

16  to help me till — you know, so I won't be homeless, so I won't

17  be under the bridge, don't have anywhere to stay till, you know,

18  till —

19  Q.   Okay.   Homeless is one thing, but your apartment rent at the

20  Cirque, have you been staying at the Cirque?

21  A.   Yes, that's where I live.

22          THE COURT:   What did you tell me it was, Mr. Paz,

23  $2,000 a month?

24          MR. PAZ:   It's 1800, Your Honor.

25          THE COURT:   Eighteen hundred, and the lease was just

*Akinola - Examination by the Court*                                          26

1    signed when?

2            MR. PAZ:  In April, Your Honor, of 2015.

3    BY JUDGE JERNIGAN:

4    Q.  April.  Why did you do that?  Why would you do that?

5    A.  Because I have a potential client that, you know, that's

6    coming on about then, but didn't work out, and, you know, to

7    stand up and try and —

8            THE COURT:  What — what kind of —

9            MR. AKINOLA:  — I'm going to live on —

10           THE COURT:  — income did he list he that?

11           MR. PAZ:  I'm not sure I have the application here,

12   Your Honor, but give me a minute.

13   BY JUDGE JERNIGAN:

14   Q.  You haven't had any income coming in since December, you

15   tell me.  You and Ricia sign a lease in April.  And then May

16   12th Ricia files bankruptcy.  And then you file bankruptcy in

17   August.

18   A.  Yes.  Things — till things get better, on them.  You know,

19   and it's about to.  We're not trying to get anything for free.

20   If it might —

21   Q.  It sure looks like it.

22   A.  No, no, no, ma'am.

23   Q.  You said those words, not me.

24   A.  But where else —

25           THE COURT:  All right.  Does anyone have anything else

*Akinola - Examination by the Court*                                      27

1    to say they think —

2              MR. AKINOLA:  What I'm saying —

3              THE COURT:  — that I need to say to do the right

4    things today?

5              MR. AKINOLA:  I do.

6    BY JUDGE JERNIGAN:

7    Q.  What's your last word?

8    A.  My last word is we're working hard every day and we're

9    trying every day as soon and I — we have a potential, you know,

10   client coming in and paying that may — I will back pay, I will

11   pay everything that I owe to Cirque.  I will back pay

12   everything.  I'm a very hard-working man.  I've went to scho- —

13   but things just happen, that things I know just not fit just for

14   the past couple of months.  And we work hard every day,

15   sleepless night, to make sure.  You know, we just business owner

16   that things just went out of that.  But we were sleepless night

17   to make sure we get things back in the —

18   Q.  What are you doing?  I don't understand what you're doing.

19   You've said you don't have clients right now.

20   A.  Yes, we work on strategy.  Whenever the funds are low, we're

21   talking to people who — you know, doing marketing based on —

22   Q.  What does that mean?

23   A.  — based on —

24   Q.  What does that mean?

25   A.  Been doing marketing based —

*The Ruling of the Court*                                              28

1    Q.   What does that mean?

2    A.   Based on ref- —

3    Q.   You don't have clients.

4    A.   Yes, but we have potential client — every day we're

5    marketing.  You know, I'm working on some — on some —

6    Q.   How do you —

7    A.   — on some —

8    Q.   — market for medically-fragile children?

9    A.   — on some admissions and stuff.  We'll go to children's

10   hospitals and pediatric clinics and group homes and state group

11   homes for medically-fragile children.  And, you know, we've got

12   a couple of admissions that we're working on, some paperwork.

13   And, you know, things are going to get better the next few

14   weeks.  And, you know, we're willing to back pay and take care

15   of things, Your Honor.

16            THE COURT:  All right.  Does anyone else have anything

17   they think is relevant?

18            MR. PAZ:  No, Your Honor.

19            THE COURT:  Okay.  Anything?

20        (No audible response.)

21                      THE RULING OF THE COURT

22            THE COURT:  All right.  I think there is cause under

23   707 and 105 and I guess 305 as well to dismiss these cases.  I

24   cannot find good faith here.  In fact, I find bad faith.  And I

25   think all of you would be well off if you would hire attorneys.

*The Ruling of the Court*                                                29

1    You just can't do the kind of work you were doing without

2    attorneys to guide you through the regulations, the various laws

3    that impact this kind of business.

4           And I don't know what's going on with this healthcare

5    business.  It kind of sounds made up, if you ask me, or a

6    possible scam, but that's not within my jurisdiction because I'm

7    dismissing these cases with prejudice to a refiling for two

8    years.

9           Ms. Durham, would you please upload an order?

10          MS. DURHAM:  Yes, I will, Your Honor.  Thank you.

11          THE CLERK:  All rise.

12      (The hearing was adjourned at 3:56 o'clock p.m.)

13                            —o0o—

14

15

16

17

18

19

20

21

22

23

24

25

State of California            )
                               )    SS.
County of San Joaquin          )



        I, Susan Palmer, certify that the foregoing is a true
and correct transcript, to the best of my ability, of the above
pages, of the digital recording provided to me by the United
States Bankruptcy Court, Northern District of Texas, Office of
the Clerk, of the proceedings taken on the date and time
previously stated in the above matter.

        I further certify that I am not a party to nor in any
way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber
by the American Association of Electronic Reporters and
Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer
Reporting Services is approved by the Administrative Office of
the United States Courts to officially prepare transcripts for
the U.S. District and Bankruptcy Courts.



                              Susan Palmer
                              Palmer Reporting Services

                              Dated May 23, 2016